IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

    Plaintiff,

v.                                                                    No. CR. 17-831 MCA

ERIC SALAZAR,

    Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on the *United States' Objections to Proposed Findings and Recommended Disposition of Defendant Eric Salazar's Motion to Suppress Evidence* [Doc. 32].[1] The Court has considered the written submissions of the parties, the record in this case, the applicable law, and is otherwise fully advised. With regard to the Proposed Findings and Recommended Disposition [Doc. 31] the Magistrate Judge entered, the Court has conducted a de novo review of those portions to which objections have been made, 18 U.S.C. § 636(b)(1), and finds itself in agreement with the Magistrate Judge, as set forth more fully below.

The United States does not object to any of the Magistrate Judge's factual determinations. The United States does, however, make a number of legal arguments. The Court will address these arguments in turn.

---

[1] Defendant did not file objections to the Magistrate Judges Proposed Findings and Recommended Disposition. However, on January 17, 2018, Defendant filed a response to the United States' objections. Unlike its civil rules counterpart, Fed. R. Crim. P. 59(b)(2) does not provide that a party may file a response to the opposing party's objections. *See* Fed. R. Civ. P 72(b)(2) ("A party may respond to another party's objections within 14 days after being served a copy."). While the Court discerns no obvious reason for this discrepancy, and because the Court ultimately rules in Defendant's favor, the Court did not review Defendant's response.

I.  **Evidence Found During an Illegal Search Must be Suppressed**

The United States quotes the Supreme Court's admonition in *Herring v. United States*, that "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S. 135, 144 (2009). The United States then argues that any police misconduct that occurred in this case was not so egregious as to warrant the suppression of evidence. [Doc. 32 at 3] In so arguing, the United States fails to recognize that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573 at 586, 100 S.Ct. 1371 (1980). Moreover, in *United States v. Bagley*, 877 F.3d 1151, 1156 (10th Cir. 2017), the Tenth Circuit recently determined that an illegal search conducted under circumstances similar to those that occurred in this case required suppression of evidence discovered during the search. There, the United States' basis for arguing that the search was not illegal was similar to the United States' current basis for arguing that there was no misconduct sufficient to justify the suppression of evidence. Specifically, the United States in *Bagely* argued that Deputy U.S. Marshals conducted a protective sweep because they "had no way of knowing, one way or another, whether anyone besides Mr. Bagley was still in the house. This uncertainty, according to the government, would have concerned the officers because they might have been subjected to an attack if someone else had remained inside." *Id*. at 1156. Similarly, the United States argues here that, even if the Court ultimately finds the protective sweep invalid, law enforcement officers conducted the sweep to protect themselves and such conduct should not result in the suppression of evidence. As the United States acknowledges, however, *Herring* "apparently has not been applied to a case factually similar to this case and the Tenth Circuit has limited the good faith exception to cases involving reliance on

a third party mistake . . ..” [Doc. 32 at 3] The Court finds that *Bagley*, and the binding precedent on which it relies, forecloses the United States' *Herring* argument.

## II. Exigent Circumstances did not Justify Seizure of the Firearm

The United States argues that exigent circumstances justify the seizure of the firearm and asserts two bases in support of its argument. First, it asserts that "it was entirely reasonable to secure the loaded firearm for the safety of the others . . .." [Doc. 32 at 4] This argument, however, assumes that law enforcement discovered the firearm while lawfully in the place where they made the discovery. If law enforcement saw the gun in plain view from a place they were lawfully positioned, the United States' argument would have some strength. However, it is "an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California,* 496 U.S. 128, 136 (1990). The Magistrate Judge recognized this distinction that the United States fails to address. He stated:

> With regard to whether it would be justified to seize a weapon, I agree with the United States that it would be if the weapon was found in plain view somewhere where [police] were legally authorized to be. So, for instance, if the police entered the house because [] exigent circumstances were found to exist, and right there in the entryway was a loaded gun, the police would certainly be able to take custody and secure that firearm. That is supported by the Tenth Circuit's decision in *United States v. Gordon*, 741 F.3d 64 at 70-71 (10th Cir. 2014). But in this case, the gun was not found in plain view until the bathroom was searched. So the real question is whether or not Deputy Cornell had justification to go into the bathroom.

[Doc. 31-1 at 150-51]. The United States acknowledges that Deputy Cornell did not find the gun until he searched the bathroom Defendant had vacated. [Doc. 32 at 2 ("Deputy Cornell went inside the bathroom and discovered a loaded .22 Ruger pistol inside a beanie cap underneath the sink, the butt of which was visible through a cabinet door that was partially ajar.")]. Because the gun only came into plain view when Deputy Cornell went into the bathroom, seizure of the gun

3

under the plain view doctrine is only permissible if Deputy Cornell was lawfully in the bathroom at the time he saw and seized the gun.

This leads to the United States' next argument: that it has met the Tenth Circuit's two part test for determining whether exigent circumstances justify the entry and search of the bathroom. [Doc. 32 at 5]. This test requires the Court to ask "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable . . .." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). The United States asserts the first prong of the test has been met because "[t]here was a bona fide 911 call, along with defendant's suspicious behavior . . .." [Doc. 32 at 5].

The Magistrate Judge considered the existence of the 911 call to be an important factor in finding that exigent circumstances existed to justify the initial entry into the apartment. [Doc. 31-1 at 136-38]. By the time Deputy Cornell entered the bathroom, however, police had obtained additional information that reduced the significance of the 911 call Lydia Sanchez, the alleged victim's mother, made. First, Deputy Armijo testified that, while he was meeting with Ms. Sanchez, she got on the phone with her daughter and told her, "I know nothing happened between you." [*Id*. at 66]. The significance of the 911 call was further dispelled when Deputy Armijo approached the front door to the apartment and heard two females and a male "conversing normally . . . [n]o one was arguing, no voices were raised, they just seemed to be talking normally." [*Id*. at 66]. After Monica Salazar (the suspected victim) opened the door, Deputy Armijo and at least one other police officer entered the apartment. [*Id.* at 67-68]. Ms. Salazar then explained that her mother dislikes her boyfriend and that she had a slight argument with him earlier in the night about a lost sweater. [*Id.* at 67-68]. Ms. Salazar then answered in

the negative when Deputy Armijo asked her "if there was any hitting, any threats, anything like that . . . ." [*Id.* at 68]. When Defendant came out of the bathroom, he also stated that he and Ms. Salazar had had an argument over a sweater and that there was no violence at all. [*Id.* at 70-71]. Although Deputy Armijo looked, he did not see any injuries on anybody he encountered in the apartment. [*Id.* at 80].

Deputy Cornell testified that Defendant was sitting on the toilet when he arrived at the apartment. [*Id.* at 25-26]. Deputy Cornell could see Defendant because the door was ajar and Defendant remained on the toilet for a period of time after Deputy Cornell's arrival.[2] [*Id.* at 26, 49]. Defendant then closed the door for a brief period (45 seconds to a minute) during which he said he was wiping. [*Id.* at 27, 51]. Deputy Cornell then heard the toilet flush and Defendant came out. [*Id.* at 27]. The record is not clear whether Deputy Cornell then immediately went into the bathroom or whether he first helped pat Defendant down for weapons.[3] Deputy Cornell's belt tape, however, demonstrates that Defendant came out of the bathroom at eight minutes and seventeen seconds into the recording and Deputy Cornell completed his search of the bathroom about one minute and twenty-three seconds later when he came out of the bathroom and questioned Defendant about why he had lied to him about not having a gun. [Gov. Exh. 2].

The United States' argument that these facts provide exigent circumstances that support the warrantless entry and search of the bathroom is unpersuasive. First, as the Tenth Circuit

---

[2] On direct examination, Deputy Cornell testified that Defendant was on the toilet for 3-4 minutes after his arrival. [Doc. 31-1 at 26]. On cross-examination he stated this time was 4-5 minutes. Deputy Cornell's belt tape, however, is the best indicator of the time that elapsed. Audio from the belt tape demonstrates that Deputy Cornell entered the apartment 17 seconds into the recording (when Defendant was already on the toilet) and that Defendant came out of the bathroom 8 minutes 17 seconds into the recording. [Gov. Exh. 2].

[3] On direct examination, Deputy Cornell testified, "He comes out. Deputies basically stop him to do a pat frisk for weapons. While they do that, I go into the bathroom just to see if anybody else is in there, if there's a weapon in there." [Doc. 31-1 at 27]. On cross examination Deputy Cornell testified, "I believe I assisted with the pat down, yes" and "I did not find any weapons on him, no." [*Id.* at 51]. Further, Deputy Cornell's belt tape does not definitively answer this question because it is difficult to identify the various male voices recorded on the belt tape.

5

recognized in *Najar*, a 911 call does not always "justify a warrantless entry upon the arrival of law enforcement." *Najar*, 451 F.3d at 720 n.7. Second, everything police learned from the time they responded to the 911 call dispelled the notion that there was an ongoing domestic violence dispute. Indeed, by the time Deputy Cornell searched the bathroom, he had already learned that the alleged victim denied that any domestic violence had taken place. [Gov. Exh. 3 at 3-5].[4] No one in the apartment had any sign of injury and the United States presented no evidence to support the existence of an ongoing domestic violence situation once police entered the apartment. During the eight minutes that Deputy Cornell was in the apartment waiting for Defendant to come out of the bathroom, Defendant asked one of the officers "What are you guys doing tonight besides coming over here?" [Gov. Exh. 3 at 12]. The officer responded that he was about to get a cup of coffee, that he was on his way to Dunkin Donuts, and that "as soon as you come out we get all this cleared up I can head back to Dunkin." [*Id.* at 12]. This casual conversation as well as all information police learned in the apartment during the several minutes they stayed in the apartment without incident while Defendant was in the bathroom are all inconsistent with the existence of exigent circumstances. This remains true even when the 911 call is combined with the initial suspicious circumstance of Defendant retreating to the bathroom when law enforcement announced their presence. The Court agrees with the Magistrate Judge's determination that the United States has failed demonstrate "an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of themselves or others" when Deputy Cornell searched the bathroom. *Najar*, 451 F.3d at 718.

This is particularly true in light of the Tenth Circuit's affirmation that a mere uncertainty and concern that others might be in a particular room does not constitute specific, articulable

---

[4] Because the transcript of the belt tape recording is consistent with the recording, for ease of reference, the Court cites to the transcript of the belt tape recording rather than the recording itself.

facts that someone is concealed. *Bagley*, 877 F.3d at 1156. Although *Bagley* addressed whether a protective sweep was valid in light of a defendant's arrest, the question the Tenth Circuit considered was similar to the question *Najar* requires courts to ask when determining whether exigent circumstances exist to justify a search: whether officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others.

    **III.    The Magistrate Judge's Recommendation is Consistent with *United States v. Torres-Castro*, 470 F.3d 992 (10th Cir. 2006)**

    **A. Law enforcement did not have probable cause to arrest Defendant prior to entering the residence and conducting a protective sweep**

The United States argues that, even though police arrested Defendant after searching the bathroom, the search of the bathroom was part of a valid protective sweep. [Doc. 32 at 5]. As the United States points out, "[p]rotective sweeps, wherever they occur, may precede an arrest, and still be incident to that arrest, so long as the arrest follows quickly thereafter." *United States v. Torres-Castro,* 470 F.3d 992, 998 (10th Cir. 2006). To determine whether a search is incident to arrest, the Court must ask, "(1) whether a legitimate basis for the arrest existed before the search, and (2) whether the arrest followed shortly after the search." *Id.* (internal citations and quotations omitted). The United States' argument that *Torres-Castro* applies to the present case fails for a number of reasons.

First, by failing to raise this argument in its opening brief, the United States has waived it. *See Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012) ("Arguments not clearly made in a party's opening brief are deemed waived."); *Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) (observing that "a party waives issues and arguments raised for the first time in a reply brief" (internal quotation marks omitted)).

Second, the United States fails to establish that probable cause existed to arrest Defendant at the time police entered the apartment. Although the United States does not name the crime it alleges was supported by probable cause when police entered the apartment, the 911 call concerned domestic violence and the United States bases the deputies' warrantless entry on the need to investigate a domestic violence call. Thus, it is clear that the United States is arguing that, at the time police entered the apartment, probable cause existed to arrest Defendant for domestic violence. The United States, however, does not specifically set forth the evidence it claims supports this probable cause.

Nonetheless, the Court knows from the record that Deputy Armijo received a notice of a 911 call reporting general domestic violence with a firearm. [Doc. 31-1 at 65]. He then went to an intersection near the apartment and met with the 911 caller, Ms. Sanchez. [*Id.* at 65]. Ms. Sanchez stated that her daughter was in a domestic violence situation with a firearm. [*Id.*] At some point during the time Deputy Armijo met with Ms. Sanchez, he overheard Ms. Sanchez tell her daughter on the phone "I know nothing happened between you." [*Id.* at 66]. Further, Deputy Armijo did not know from where Ms. Sanchez received information that there was a domestic violence situation. [*Id.* at 74-75].

After meeting with Ms. Sanchez, Deputy Armijo and other law enforcement went up to the front door of the apartment where Deputy Armijo heard two females and a male "conversing normally . . . [n]o one was arguing, no voices were raised, they just seemed to be talking normally." [*Id.* at 66]. When he knocked on the door and announced "Sheriff's Department", all talking immediately ceased and he heard footsteps moving away from the front door area. [*Id.* at 67].

Thus, at the time Deputy Armijo went into the apartment he knew that the alleged victim's mother had called 911 to report a domestic violence situation involving a firearm, although he did not know the source of her information. He also knew that, after calling 911, Ms. Sanchez told her daughter that she knew "nothing happened between you". When Deputy Armijo went to the front door he could hear normal conversation. When Deputy Armijo announced the presence of law enforcement, he heard footsteps moving away from the door. These facts do not constitute probable cause to arrest Mr. Salazar for domestic violence.

Further, police did not immediately conduct a protective sweep and then arrest Mr. Salazar. Instead, while in the apartment, but before arresting Mr. Salazar, police gained additional information that undermined any justification they might have had to arrest Mr. Salazar for domestic violence. Thus, the United States' argument that the search of the bathroom was justified as a protective sweep premised on probable cause to arrest Defendant for domestic violence is without merit.

**B. Evidence seized was not attenuated from any illegality**

The United States argues that any evidence seized was attenuated from any illegality and, therefore, not subject to suppression. The United States, however, did not present this argument in its briefing. Just as with the United States' previous argument, this failure constitutes a waiver of the argument. *See Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012) ("Arguments not clearly made in a party's opening brief are deemed waived."); *See Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) (observing that "a party waives issues and arguments raised for the first time in a reply brief" (internal quotation marks omitted)). Even if the United States did not waive the argument, however, its assertion that intervening circumstances existed to justify the seizure of the firearm and ammunition is without merit.

*i. There were not intervening circumstances as to the firearm*

The United States asserts that "Defendant's denial of knowledge of the firearm, *moments after* its discovery, constituted an intervening circumstance that dissipated any taint from any Fourth Amendment violation." [Doc. 32 at 7 (emphasis added)]. The problem for the United States, of course, is that the alleged intervening fact (Defendant's denial of knowledge of the firearm) occurred *after* the search in question. The United States attempts to address this inconvenient fact by asserting that the "firearm had yet to be permanently seized and taken into custody." [Doc. 32 at 7]. Thus, the United States' argument appears to be that an otherwise illegal search can be cured if, after police find evidence incriminating a suspect, the suspect disavows knowledge of the evidence, *and then* police permanently seize the evidence. This argument is wholly without merit. Acceptance of the argument would mean that police could illegally search a suspect's house, find a bag full of suspected drugs, wait for the suspect to disavow knowledge of the suspected drugs, and then cure the illegal search by permanently seizing the suspected drugs after conducting a field test on the drugs. Such a result is unprecedented and contrary to *Mapp v. Ohio*, 367 U.S. 643 (1961) and its progeny.

*ii. There were not intervening circumstances as to the ammunition*

The United States makes a similar argument with regard to the ammunition police found in Defendant's pocket after they arrested him. Here, it appears that the United States is arguing that the arrest and pat down of Defendant constitute intervening circumstances. The arrest would not have occurred, however, but for the fact that police illegally seized the gun they charged Defendant with possessing. Because evidence of the gun must be suppressed, so too must evidence obtained pursuant to a search done in connection with Defendant's arrest for possession of the gun.

## IV. Defendant Retained a Property Interest in the Firearm at the Time of the Illegal Search

The United States argues that Defendant lost any expectation of privacy in the firearm seized because, by denying knowledge of the firearm after police discovered it, he abandoned it. [Doc. 32 at 8]. The first problem with this argument is that it fails to recognize that the constitutional violation at issue is the search of the bathroom, not simply the seizure of the firearm. As set forth above, the Magistrate Judge agreed that police could legally seize the firearm as long as they saw it in plain view while in a place they were legally authorized to be. Police, however, found the gun during an illegal search of the bathroom – a place where Defendant had a reasonable expectation of privacy. As a result, a factual nexus exists between the constitutional violation and the evidence seized. This requires suppression of the evidence seized. *See United States v. Nava-Ramirez*, 210 F.3d 1128, 1132 (10th Cir. 2000) (suppression of evidence required when factual nexus exists between constitutional violation and thing seized).

Second, every case the United States cites involves abandonment that occurred *before* the search or seizure in question. The Magistrate Judge addressed this issue during the suppression hearing. He pointed out that Defendant did not deny any connection to the gun until *after* law enforcement searched the bathroom and seized the gun. [Doc. 31-1 at 108]. He then pointed out that, under the United States' argument, law enforcement would be able to illegally search a house, find illegal drugs, confront the suspect with the illegal drugs and, if the suspect then denied knowledge of the drugs, the illegal search would be cured. *Id.*, 160. Again, such a result would be contrary to *Mapp* and its progeny. Therefore, the Court agrees with the Magistrate Judge – a defendant's denial of knowledge of incriminating evidence made after law

enforcement finds the evidence pursuant to an illegal search does not cure an illegal search of the taint that requires suppression of evidence.

**WHEREFORE, IT IS HEREBY ORDERED** that the United States' *Objections* [Doc. 32] are overruled.

**IT IS FURTHER ORDERED** that the Magistrate Judge's *Proposed Findings and Recommended Disposition* [Doc.31] are adopted as the decision of the Court.

**SO ORDERED** this 23rd day of January, 2018.

_____
M. CHRISTINA ARMIJO
CHIEF UNITED STATES DISTRICT JUDGE